U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

**United States Bankruptcy Judge**

Signed August 13, 2012

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| IN RE: § | |
| § | |
| § | CASE NO. 11-36037-BJH-11 |
| **MRI BELTLINE INDUSTRIAL, L.P.,** § | |
| § | |
| Debtor. § | |
| § | |
| § | |

### MEMORANDUM OPINION AND ORDER

MRI Beltine Industrial, L.P. (the "Debtor") filed a voluntary petition for relief under chapter 11 on September 27, 2011 (the "Petition Date"). On November 17, 2011, the Debtor moved for authority to use cash collateral. *See* Docket No. 39. MidFirst Bank ("MidFirst") opposed that relief. The Court held an interim hearing on December 19, 2011 and granted the Debtor authority for the interim use of cash collateral pursuant to an approved budget. The duration of the Debtor's use of cash collateral has been extended several times by the parties' agreement. *See, e.g.,* Docket Nos.

**Memorandum Opinion and Order**

48, 49, 52, 63, 66, 83 and 97. The Court held a final hearing to consider the use of cash collateral on July 5, 2012. At the final hearing, the parties disputed two issues: (i) whether an assignment of rents in favor of MidFirst is "conditional" or "absolute" under Texas law, and (ii) whether the Debtor may be authorized to use cash collateral to pay its attorneys' fees over MidFirst's objection – *i.e.*, whether the Court may impose a"carve-out" from MidFirst's collateral in favor of Debtor's counsel. This Memorandum Opinion and Order contains the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

**I.    Factual Background**

The Debtor owns four commercial buildings located at 260, 320 and 350 South Beltline Rd., Irving, Texas and 309 North Beltline Rd., Irving, Texas (collectively, the "Properties") that it leases to various tenants. The Debtor's source of revenue is rents received from those tenants. The Debtor and MidFirst entered into a loan agreement in 2006 in the original principal amount of $4.2 million (the "MidFirst Loan"). The MidFirst Loan is evidenced by a Promissory Note dated July 28, 2006 and five amendments to the Promissory Note. The MidFirst Loan is secured by a "Deed of Trust, Security Agreement and Financing Statement" and an "Assignment of Leases and Rents" ("the Assignment"). By virtue of these documents, MidFirst is a secured creditor holding a first lien on the Properties. MidFirst filed a proof of claim in the bankruptcy case indicating that it is owed some $4,260,469.16, consisting of principal, pre-petition interest, and legal, appraisal and environmental fees.

On March 8, 2012, MidFirst moved for relief from the automatic stay under 11 U.S.C. § 362(d)(1) and (d)(2), asserting that its appraisal valued the Properties at $3.9 million. At the June 19, 2012 hearing on MidFirst's motion, the Court denied the motion without prejudice, finding that

the Properties were necessary for an effective reorganization and that there was equity in the Properties, although the Court was "not prepared today to place an absolute value on the debtor's property on the petition date," *Tr.* 6/19/12, 8:7-8. The Court found MidFirst to be adequately protected by a small equity cushion, but recognized "that as time passes, the equity cushion is being quickly diminished and may reach a point if we don't achieve confirmation of a plan very promptly where that line tilts and crosses in the other direction. But for now, the Court is satisfied that there is sufficient equity to adequately protect the Bank." *Id*. at 8:20 - 9:1.

The Debtor filed a disclosure statement the day before the hearing on MidFirst's lift stay motion, *see* Docket No. 80, contending that the Properties were worth $4,750,000. That disclosure statement was approved on July 23, 2012[1] and the hearing to consider confirmation of the Debtor's proposed plan of reorganization is currently scheduled for November 1, 2 and 5, 2012.

## II.    Legal Analysis

### A.    Is the Assignment "Conditional" or "Absolute"?

To answer this question, the Court will look to certain case law precedents and a recent Texas statute. As the Fifth Circuit has noted,

> merely labeling a transaction as an "assignment" does not necessarily make it a true assignment. The intent of the parties is an essential element of an assignment and, at least as between them, takes precedence over the label attached to the transaction. For instance, if the parties merely intend to pass a collateral security interest, but phrase the transaction in terms of an absolute assignment, the interest passed will be governed by their intent and will not be considered an assignment.

*Southmark Corp. v. FDIC.*, 142 F.3d 1279 at *6 (5th Cir. 1998) (unpublished disposition).

Texas subscribes to the lien theory of mortgages. Under this theory, the mortgagee is not the owner of the property and is not entitled to its possession, rentals or profits. Therefore,

---

[1] An appropriate form of order approving the disclosure statement has not yet been submitted.

**Memorandum Opinion and Order**                                                                 3

mortgagees typically take an assignment of rents as additional security for the loan, and Texas courts have followed the common law rule that an assignment of rents is not effective until the mortgagee takes possession of the property, or impounds the rents, or has a receiver appointed, or takes some other similar action. *Matter of Village Properties, Ltd.*, 723 F.2d 441 (5th Cir. 1984). Texas courts have, however, held that an "absolute" assignment of rents automatically transfers the right to rents to the mortgagee when a specified condition – typically default – occurs. *Id.* at 443. Therefore, under a plethora of Texas cases, an absolute assignment passes title to the rents to the mortgagee, instead of creating a security interest. *Id.*; *see also FDIC v. International Property Mgt.*, 929 F.2d 1033 (5th Cir. 1991). In such a case, title to the rents is in the mortgagee, but the borrower retains the right to receive the rents, generally pursuant to a license granted in the loan documents to collect the rents unless and until there is a default. *Id.* Texas courts have been reluctant to construe an assignment of rents as an absolute assignment. *Village Properties*, 723 F.2d at 443. In fact, Texas courts require "especially clear" evidence to create an absolute assignment. *FDIC*, 929 F.2d at 1036; *In re Four Bucks, L.L.C.,* No. 09-42629, 2009 WL 1857432 (Bankr. N.D. Tex. June 29, 2009) (Lynn, B.J.). "In order to determine the parties' intent, a court must examine both the assignment of rents clause and the security agreements executed contemporaneously with it." *Id.* The *Four Bucks* court noted:

> Courts faced with such a determination of intent consider four indicia that would evidence such an intent.
>> 1. A statement of intent to assign absolutely rights, interests, estates, or rents to the mortgagee, typically a lender, and that the assignment was intended to be presently effective.
>>
>> 2. A statement of obligation on the part of the mortgagor to collect and hold rent payments solely for the benefit of the mortgagee upon default.
>>
>> 3.. A clause eliminating any duty on the part of mortgagee to institute

> legal action in order to assume control of the property or the rents therefrom.
>
> 4. A clause referencing the automatic transfer of rights, interests, estates, or rents upon a specified condition, normally a default.
>
> Courts do not require all four of these indices to be present. Rather the presence of each individual element in an assignment can assist the court in determining whether the document language is "clear and unambiguous" that the parties' intent was to create an absolute assignment.

*Four Bucks*, 2009 WL 1857432 at *2.

The court in *In re Amaravathi Ltd. P'Ship*, 416 B.R. 618 (Bankr. S.D. Tex. 2009) (Isgur, B.J.), decided within a month of *Four Bucks*, took a different approach. The *Amaravathi* court reviewed Texas and Fifth Circuit precedents on the subject, and concluded that notwithstanding the above analysis, rents constitute property of a debtor's bankruptcy estate under 11 U.S.C. § 541(a)(6) notwithstanding a conclusion that a particular assignment is an "absolute" assignment after consideration of the above indicia. The *Amaravathi* court further concluded that neither the seminal Texas case on the subject, *Taylor v. Brennan*, 621 S.W.2d 592 (Tex. 1981), nor *International Property, supra*, were decided in a bankruptcy context and therefore failed to consider the effect of *U.S. v. Whiting Pools, Inc.*, 462 198, 204 (1983). The court noted:

> Synthesizing *Whiting Pools* and *International Property* leads to the conclusion that the post-petition rents at issue in this case are property of the estate. This conclusion is unmistakable despite the fact that the *International Property* lender was permitted to retain the "absolutely" assigned rents. The key difference between the ostensibly inconsistent outcomes in this case and *International Property* is the bankruptcy framework. Outside of bankruptcy, *International Property* stands for the proposition that once default occurs, the lender immediately has rights to the "absolutely" assigned rents. The debtor cannot keep rents received post-default. Upon receiving the rents, the lender must then take the cash from those rents and apply it to the mortgage debt. In doing so, the lender becomes both the equitable and the legal title holder of the cash from the rents. It is not until the cash is applied to the debt that the equitable title transfers from the debtor to the lender. This case would follow the outcome of *International Property* if the Debtors had not filed bankruptcy. Upon the

> Debtors' bankruptcy filing, however, § 541(a)(1) brings all property in which the Debtors hold an equitable interest into the estate. At the time of the filing of the bankruptcy petition, the Debtors held equitable title to all future rents, despite the lender's right to the rents under the "absolute" assignment.

*Amaravathi*, 416 B.R. at 633.

This Court need not decide whether it aligns itself with the *Amaravathi* court or the *Four Bucks* court because it concludes that the Texas legislature recently enacted a statute that resolves the issue before it in this case. As noted in *In re Lack's Stores, Inc.*, No. 10-60149, 2012 WL 3043093 (Bankr. S.D. Tex. July 25, 2012), the Texas legislature enacted, on June 17, 2011, Senate Bill No. 889 which, among other things, added a new chapter 64 to the Texas Property Code. Chapter 64 is entitled "Assignment of Rents to Lienholder." Tex. Prop. Code Ann. § 64.001, *et seq.*, (West 2007 & Supp. 2012). Section 64.051 of that chapter 64 provides:

> (a) An enforceable security instrument creates an assignment of rents arising from real property securing an obligation under the security instrument, unless the security instrument provides otherwise or the security instrument is governed by Section 50(a)(6), (7), or (8), Article XVI, Texas Constitution.[2]
>
> (b) An assignment of rents creates a presently effective security interest in all accrued and unaccrued rents arising from the real property described in the document creating the assignment, regardless of whether the document is in the form of an absolute assignment, an absolute assignment conditioned on default or another event, an assignment as additional security, or any other form. The security interest in rents is separate and distinct from any security interest held by the assignee in the real property from which the rents arise.
>
> (c) An assignment of rents does not reduce the secured obligation except to the extent the assignee collects rents and applies, or is obligated to apply, the collected rents to payment of the secured obligation.

The legislative history to Senate Bill No. 889 indicates that it was intended to

---

[2] These sections of the Texas Constitution are inapplicable in the present context, since they deal with home equity loans, reverse mortgages, or the conversion of a personal property lien secured by a manufactured home to a lien on real property.

**Memorandum Opinion and Order** 6

clarify the process for creating, perfecting, and enforcing a security interest in rents. In 1981, the Texas Supreme Court held in *Taylor v. Brennan*, 621 S.W.2d 592 (Tex. 1981), that a security interest in rents does not become operative until the lender proactively attempts to enforce it. This meant that in a priority contest between a mortgage lender with a recorded but unenforced assignment of rents and a judgment lien creditor who had served a writ of garnishment on rents, the judgment lien creditor would win.

Lenders responded by entering into absolute assignments of rents. Absolute assignments state that the lender is the owner of any rental income at the time it is paid, regardless of whether the lender ever actually takes possession of the rental income. Absolute assignments have created new problems for lenders. It has been argued in some bankruptcy cases that rents collected and kept by a property owner should be credited against the owner's debt to the lender, even though the lender did not actually receive rent payments, because the lender "owns" the funds.

The bill would simplify a confusing area of the law, establish that rents not actually received by the lender could not be credited against the property owner's debt, establish that a lender with a recorded mortgage would have priority and perfection of its lien on rents upon filing of the mortgage, and set out a statutory means of enforcement.

Tx. B. An., S.B. 889, 5/20/11. Chapter 64 was added to the Texas Property Code by Acts 2011, 82nd

Leg., ch. 636 (S.B. 889), § 2. Section 3 of that bill deals with the effective date of Senate Bill 889.

It provides:

(a) except as otherwise provided by this section, Chapter 64 . . . governs the enforcement of an assignment of rents, the perfection and priority of a security interest in rents, and the attachment and perfection of a security interest in proceeds regardless of whether the document creating the assignment of rents was signed and delivered before the effective date of this Act.

(b) Chapter 64 . . . does not affect an action or other proceeding commenced before the effective date of this Act.

(c) Subsection (a), Section 64.051 . . . applies only to a security instrument signed and delivered on or after the effective date of this Act. A security instrument signed and delivered before the effective date of this Act is governed by the law that applied

to the instrument immediately before that date, and the former law is continued in effect for that purpose.

Acts 2011, 82nd Leg., ch. 636 (S.B. 889), § 3.

The Court concludes that the net effect of these provisions is as follows: Any enforceable security instrument executed after June 17, 2011 automatically creates an assignment of rents (whether or not a separate document entitled "Assignment of Rents" is also executed) unless the security instrument (i) provides otherwise, or (ii) is governed by three specific provisions of the Texas Constitution, none of which are applicable here. An assignment of rents, executed *at any time* before June 17, 2011, is deemed to create a presently effective *security interest* in rents (as opposed to what the case law has previously referred to as an "absolute" assignment which passes *title* to the rents), as long as the assignment is not the subject of an action or proceeding commenced before June 17, 2011.

Here, the Assignment was signed and delivered prior to June 17, 2011, and the Debtor did not file its bankruptcy case until after June 17, 2011. Therefore, the Court concludes that subsection (b) of section 64.051 applies, and the result is that the Assignment created a security interest in, and did not pass title to, the rents in favor of MidFirst. Therefore, in the vernacular of *Taylor v. Brennan*, *supra*, the Assignment is "conditional" or "collateral" and not "absolute." In the words of the *Lack's Stores* court, after June 17, 2011, "both 'absolute' and 'collateral' assignments of rents are actually security interests," as long as the action or other proceeding to enforce the interest was commenced after the effective date of the Act. *Lack's Stores*, 2012 WL 3043093, at *7.

MidFirst did not attempt to enforce its interest in rents until after June 17, 2011. Accordingly, the Court rejects MidFirst's argument that it holds title to, not a security interest in, rents generated by the Properties. Therefore, the rents constitute property of the estate and "cash collateral" and may be used by the Debtor with Court authority pursuant to sections 363 and 361 of

**Memorandum Opinion and Order** 8

the Bankruptcy Code.

### B. Can a Carve-Out Be Imposed Over MidFirst's Objection?

MidFirst argues that a carve-out may not be imposed in favor of Debtor's counsel over its objection because the phrase "carve-out" is a bankruptcy term of art meaning solely a *consensual* agreement between a lender and a bankruptcy debtor that permits the debtor to use the lender's collateral for the payment of administrative expenses, including attorneys' fees. *See, e.g., In re Blackwood Assoc.,* 153 F.3d 61, 68 (2nd Cir. 1998); *In re California Webbing Indus. Inc.*, 370 B.R. 480, 483 (Bankr. D.R.I. 2007); *In re Fortier*, 299 B.R. 183, 191 n. 14 (Bankr. W.D. Mich. 2003); *rev'd on other grounds*, 315 B.R. 829 (W.D. Mich. 2004); *In re White Glove, Inc.*, No. 98-12493DWS, 1998 WL 731611 (Bankr. E.D. Pa. Oct. 14, 1998). MidFirst therefore asserts that absent its consent, the Debtor cannot be authorized to use cash collateral to pay the Debtor's counsel's fees either pursuant to 11 U.S.C. § 363 or otherwise. The Court first concludes that MidFirst's argument overlooks the plain text of 11 U.S.C. § 363(c)(2), which provides that the trustee (which, pursuant to 11 U.S.C. § 1107, is interpreted to include a debtor-in-possession), may not use cash collateral *unless* "(A) each entity that has an interest in such cash collateral consents; *or* (B) the court, after notice and a hearing, authorizes such use . . . in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2) (emphasis added).[3]

---

[3] Section 363(c)(2) deals with the use of cash collateral in the ordinary course of the operation of the debtor's business. It provides that the trustee may use property of the estate in the ordinary course of business without notice or a hearing, but the trustee may not use cash collateral without the lienor's consent or a court order. MidFirst argues that a carve-out is an agreement used only in bankruptcy cases, and thus the Debtor can never show that a carve-out is in the ordinary course of its business. While that may be true (and the Court expresses no view), MidFirst overlooks the fact that Section 363(c)(1) authorizes the trustee to use property of the estate other than in the ordinary course of business, *after notice and a hearing*. In contrast, when a contemplated use of cash collateral is in the ordinary course of business, the trustee may use it if the lienor consents. Otherwise, notice and a hearing is required. In either case, the trustee may use cash collateral absent consent after notice and a hearing if approved by the Court.

**Memorandum Opinion and Order**                                                                 **9**

MidFirst further asserts that the Debtor's request for a "rolling carve-out" of $15,000 per month is premature because the Debtor's counsel has not yet filed an application for fees and there is "no assurance at this time that MidFirst will be paid in full in this case leaving excess cash collateral that is available to pay administrative expenses such as Debtor's professional fees." *See MidFirst Bank'rs Supp. To its Resp. And Obj. To Debtor's Mot. For Interim and Final Orders Authorizing the Use of Cash Collateral.*, p. 4-5.[4]

In contrast, the Debtor argues that the sole issue before the Court is one of adequate protection under 11 U.S.C. § 363(e) – *i.e.*, that as long as MidFirst is adequately protected against diminution in the value of its collateral, the Court may impose a carve-out over MidFirst's objection. *See*, *e.g.*, *In re Buttermilk Towne Center, L.L.C.*, 442 B.R. 558 (6th Cir. BAP 2010); *In re Proalert, L.L.C.*, 314 B.R. 436 (9th Cir. BAP 2004); *In re Coventry Commons Assoc.*, 149 B.R. 109 (Bankr. E.D. Mich. 1992). *Buttermilk* considered whether a replacement lien in post-petition rents provided adequate protection to a lender holding a lien on pre-petition rents, and concluded that it did not, because the lender already had a lien on post-petition rents under 11 U.S.C. § 552. The *Proalert* case held that a debtor may use cash collateral to pay professional fees if the secured creditor is adequately protected, without the need to show a benefit to the secured creditor from such use under 11 U.S.C. § 506(c). The *Proalert* court found that in the case before it, the bankruptcy court had adequately protected the lender's interest by virtue of its order requiring the debtor to "replenish any funds used for payments to the two professionals . . . on a dollar for dollar basis" on or before a date certain. The *Coventry Commons* case was decided in the context of plan confirmation. The

---

[4] MidFirst also argues, and the Debtor does not dispute, that MidFirst's lien continues in the post-petition rents and revenues under 11 U.S.C. § 552(b), such that any offer of adequate protection premised upon a replacement lien in post-petition rents is illusory.

**Memorandum Opinion and Order** 10

debtor's plan provided for a cash payment to the lender of $400,000 to be made from accumulated post-petition rents, with the balance amortized over thirty years with a balloon payment in year seven. The plan also proposed that another $200,000 of accumulated post-petition rents would be paid to satisfy chapter 11 administrative and operational expenses. The lender argued that *all* accumulated post-petition rents must be used to pay its debt. The *Coventry Commons* court disagreed as long as the lender would be adequately protected. *See also In re Las Torres Dev. L.L.C.,* 413 B.R. 687 (Bankr. S.D. Tex. 2009) (authorizing use of cash collateral over the lender's objection to pay certain administrative expenses); *In re Robotic Vision Systems, Inc.*, 367 B.R. 232, 237 (1st Cir. BAP 2007) ("lenders often agree, or, conditions permitting, bankruptcy courts will authorize over objection, the use of cash collateral to fund such professional services").

Moreover, the Debtor argues that MidFirst is adequately protected by virtue of the fact that the Debtor is making periodic interest-only payments on MidFirst's loan in the amount of $20,500 per month, and that after that payment and its other expenses each month, the Debtor has had positive cash flow of approximately $11,500 on average during the months it has operated in chapter 11. The Debtor also argues that it is improving occupancy rates at the Properties and that the Court previously found, in connection with MidFirst's lift stay motion, that there is equity in the Properties.

However, based on the record before it, the Court need not decide whether, or under what circumstances, it may impose a carve-out for the payment of a debtor's attorneys' fees over a bank's objection. Even assuming the Debtor is correct that the Court may do so where MidFirst is adequately protected, the Court declines to do so on the facts before it here for at least two reasons.

First, the Court agrees with MidFirst that the Debtor's request is premature as the Debtor's

counsel has not filed a fee application and is unlikely to do so prior to a hearing on confirmation of the Debtor's proposed plan of reorganization. At the confirmation hearing, the Court will be better able to assess the Debtor's (i) equity position in the Properties, and (ii) ability to otherwise pay its administrative expenses.

Second, although the Court found at the conclusion of the lift stay hearing that the Debtor had equity in the Properties, it declined to place an exact number on that equity cushion, instead stating that MidFirst was protected "by a small equity cushion," and further noting "that as time passes, the equity cushion is being quickly diminished and may reach a point if we don't achieve confirmation of a plan very promptly where that line tilts and crosses in the other direction." *Tr. 6/19/12, 8:20-9:1*. At the lift stay hearing the Debtor presented evidence of the value of the Properties on the petition date, and its appraiser projected their value in the future, but as Debtor's counsel conceded at the hearing on the present motion, the Debtor has not presented evidence of the value of the Properties *today*. *In re Las Torres Dev. L.L.C.*, 413 B.R. 687, 695 (Bankr. S.D. Tex. 2009) ("the parties requesting court approval to use cash collateral over the secured creditor's objection must prove there is adequate protection for that creditor"). Yet, the Debtor now proposes to take approximately $150,000 of MidFirst's collateral away[5] at a time when there is no assurance that the Debtor's proposed plan is confirmable and/or that MidFirst will be paid in full under such plan. Accordingly, the Court declines to impose a rolling carve-out over MidFirst's objection when the case is nearing confirmation and the Court has previously found that any equity cushion is small and eroding daily. *Cf. Las Torres*, 413 B.R. at 697 (finding adequate protection by virtue of a *20%*

---

[5] The Debtor seeks a "rolling carve-out" in the amount of $15,000 per month for each of the ten months it has been operating in chapter 11.

**Memorandum Opinion and Order** 12

equity cushion).

For these reasons, the Court concludes that imposing a carve-out in the amount of $15,000 per month over MidFirst's objection is impermissible. That portion of the Motion is therefore denied, and the parties are directed to submit a final order authorizing the use of cash collateral which does not provide for such a carve-out.

**SO ORDERED**.

### End of Memorandum Opinion and Order ###